UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN CRAIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:19-CV-0058-G |
| B. RILEY FBR, INC., and GACP II, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the defendants' motion for summary judgment.

Defendants' Motion for Summary Judgment ("the motion") (docket entry 48).  For

the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in part.

### I.  BACKGROUND

#### A.  Factual Background

This suit arises out of a dispute between Kevin Craig ("Craig"), his former

employer B. Riley FBR, Inc. ("FBR"), and Great American Capital Partners II, L.P.

("GACP II"), a sister company to FBR.  Both FBR and GACP II operate as subsidiary

companies under B. Riley Financial, Inc.  FBR is "a research-centric investment bank"

specializing in "corporate finance, research, sales and trading services to corporate,

institutional and high net worth clients."  Appendix to Plaintiff's Response to

Defendants' Motion for Summary Judgment ("Plaintiff's APP.") (docket entry 57) at

698.[1]  GACP II is a wholly owned limited partnership that functions as an

investment vehicle for "middle market public and private companies" seeking "risk-

adjusted returns with downside protection."  *Id*. at 692.

## 1. *FBR*

On December 27, 2016, FBR Capital Markets & Company ("FBRC") hired

Craig as a senior vice president of its Small Business Investment Companies Funds

Placement Group ("SBIC" or "SBIC Group").  Plaintiff's Complaint ("Complaint")

(docket entry 1) at 2.  The SBIC Group identifies and courts potential middle-market

investors for various investment opportunities.  The plaintiff's primary responsibility

at FBRC was to assist in this mission.  On June 1, 2017, FBRC was acquired by B.

Riley Financial, Inc. and operated as a subsidiary of B. Riley Financial under the new

name B. Riley FBR.  *Id*. at 3.

The plaintiff and FBR entered into a written contract ("the Employment

Agreement") spelling out the terms of Craig's at-will employment.  *See generally*

Plaintiff's APP. at 49-54.  The Employment Agreement specifies three sources of

compensation at issue here: (1) base salary; (2) commission payments under the

---

[1]     When citing to the parties' briefing, the court refers to pagination listed
on the bottom of the PDF, not as generated by ECF.

Dedicated SBIC Group Commission Pool ("SBIC Group Pool" or "Group Pool"); and (3) carried interest payments.

Under section 2(a) of the Employment Agreement, Craig's "annual base salary" was $160,000. *Id.* at 49.

Section 2(b) of the Employment Agreement governs the allocation and distribution of commission payments among SBIC Group members. On the closing of an investor by the SCBIC Group, FBR receives a "placement fee" of between 2.5% and 2.75% of the final invested amount. *See* Defendants B. Riley FBR, Inc. and GACP II, L.P.'s Brief in Support of Motion for Summary Judgment ("Defendants' Brief in Support") (docket entry 49) at 8. FBR then sets aside 40% "of the net placement fees received in connection with the private placements completed by the SBIC Group" into a shared Group Pool while retaining the remaining 60% ("the 60/40 agreement"). Plaintiff's APP. at 49. The net placement fees paid by final investors determine each SBIC Group member's relative interest in the SBIC Group Pool. Eric Rosiak ("Rosiak"), the Head of SBIC and Craig's supervisor, maintained a list demonstrating the "assignment of each prospect and client to each senior member of the SBIC group" and, on that basis, each member's accumulated interest in the Pool. *Id*. at 49-50. Each member receives, on a quarterly basis, distributions from the Pool upon the satisfaction of two conditions. First, to receive a distribution, an SBIC Group member's interest in the Pool must exceed 50% of his annual base salary

in the relevant year.  *Id*. at 50.  Second, the "distributions from the SBIC Group Commission Pool . . . are contingent upon [the member's] continued employment until" the time of distribution.  *Id*.

Finally, SBIC Group members may receive carried interest payments under Section 2(d) of the Employment Agreement.  *Id*. at 50-51.  However, SBIC's revenue from carried interest payments on closed investments is not guaranteed.  Rather, the investments must generate surplus interest in the market before the SBIC Group receives any surplus interest.  *See* Appendix in Support of Defendants B. Riley FBR, Inc. and GACP II, L.P.'s Brief in Support of Motion for Summary Judgment ("Defendants' APP.") (docket entry 52) at 57.  If the investments are profitable, an SBIC Group member receives a carried interest payment on the occurrence of two conditions.  First, Rosiak, "in consultation with [Ken Slosser,] Head of Investment Banking [at FBR]," must decide to allocate a carried interest payment to the SBIC Group member.  Plaintiff's APP. at 51.  Second, if Rosiak allocated an interest payment, the payment "shall be considered earned" by the SBIC Group member only after twelve months have passed since the closing date of the investment.  *Id*.  Unlike the commission payments under Section 2(b), carried interest payments under Section 2(d) are not subject to a "continued employment" condition.  Indeed, the Employment Agreement provides that "[o]nce considered earned," the Group

member is "entitled to receive the allocated Carried Interest Payment . . . without regard to [the member's] employment status with" FBR.  *Id*.

Although Craig sought placements for several investment opportunities, he closed investors on only one occasion.  Defendants' Brief in Support at 7.  This investment opportunity is herein referred to as "SBIC Fund 1."  The plaintiff closed three investors in SBIC Fund 1 for which he claims commission and carried interest payments.  *Id*.  Each investor brought in by Craig invested $1,000,000, generating an undisputed total of $80,000 in placement fees for FBR.  *Id*. at 7-8.  Under the 60/40 agreement between FBR and SBIC, the SBIC Group Pool received a total of $32,000 from the three investors to be distributed according to the provisions of the Employment Agreement.  *Id*. at 8.  Despite Craig's contributions, Rosiak asserted that he "was still covering" Craig's "deficits to the pool" and had to "make up for [Craig's] lack of performance" at this time.  Plaintiff's APP. at 68.

Rosiak terminated Craig's employment on January 18, 2018.  Craig claims unpaid commission and carried interest payments generated from his work on SBIC Fund 1. Plaintiff's Brief in Support of Response to Defendants' Motion for Summary Judgment (docket entry 54) ("Plaintiff's Response") at 17.  At the time of his termination, Craig had been paid a pro rata salary of $11,697.27.  *Id.* at 40.  The final closing date for SBIC Fund 1 occurred on June 19, 2019.  Defendants' Brief in Support at 9.  SBIC Fund 1 has generated no surplus interest.  *Id*.  Finally, Rosiak

- 5 -

maintained that he would not allocate any carried interest payment to Craig under Section 2(d) even if SBIC Fund 1 accrued surplus interest. *Id.*

### 2. *GACP II*

GACP II, a sister company to FBR, is a limited partnership wholly owned by B. Riley Financial, Inc. that "raises capital and provides financing to middle market companies." *Id.* Craig alleges that he entered an oral contract with GACP II sometime in early June 2017 under which Craig would identify and solicit investors for a GACP II fundraise. *See* Plaintiff's Response at 19. Craig alleges that Rosiak communicated the offer on behalf of GACP II. *Id.* The putative oral contract contained the following terms: a 1.5% placement fee on any capital committed to GACP II solicited by Craig; the 1.5% placement fee would be paid directly to the individual that introduced the investor to GACP II; the 1.5% placement fee was not subject to a 60/40 split; and the 1.5% placement fee was fully payable within "two or three years." *Id.*

The plaintiff asserts that GACP II, through a lengthy series of communications before and after the alleged June 2017 oral contract, intentionally or unintentionally gave Rosiak the authority to extend the offer to Craig on behalf of GACP II. John Ahn ("Ahn"), President and general partner of GACP II, was the primary point of contact between Craig, Rosiak, and GACP II.

In May 2017, before Craig entered into the alleged oral contract, Rosiak and Ahn held several in-person meetings.  See *id*. at 16-18.  During the meetings, the two discussed the possibility of SBIC raising funds on behalf of GACP II and discussed "potential introductions" that the SBIC Group – including Craig specifically – could make to prospective investors.  Plaintiff's APP. at 446-47.  Although Ahn cannot not recall specific details, Ahn believed that the issue of SBIC's compensation in the form of commission payments and fees was "probably" discussed at one of the meetings. *Id*. at 450.  Ahn "assumed" that SBIC Group members expected compensation if they brought in an investor because "that's the way [the] business works, you get paid for doing things."  *Id*. at 448-49.  Rosiak also left one of the meetings with the impression that GACP II would compensate the SBIC Group if the Group raised funds on behalf of GACP II.  *Id*. at 72-73.  Ahn also assumed that any communication he made to Rosiak during the meetings and beyond would be transmitted to Craig.  *Id*. at 454.

After one of the meetings, Rosiak sent a follow-up email to Ahn stating that he believed that SBIC could "be helpful to [GACP II] in" an upcoming fundraiser.  *Id*. at 272.  Ahn also directed his assistant to send the GACP II Investor Presentation to Rosiak and instructed Rosiak to "keep it internal" or else ensure that the prospective investor sign a non-disclosure agreement.  *Id*. at 427.  Rosiak then forwarded the Investor Presentation to Craig, instructing him to come up with a list of potential

investors in GACP II and noting that Ahn would be sending other internal GACP II documents.  *Id*. at 342.

Shortly thereafter on May 22, 2017, Rosiak sent SBIC's compiled list of nearly 150 prospects – over 50 of which Craig identified – to Ahn.  *Id*. at 432-37.  Ahn responded by saying he needed to "think about it" and that he didn't want SBIC "mass marketing" the fundraise.  *Id*. at 436.  Ahn also noted that he alone at GACP II "approve[d] the [final] call list" and that SBIC Group members could not proceed without his green light.  *Id*. at 439.  Rosiak forwarded these emails to Craig.  At this point, Ahn "definitely" knew that Rosiak and Craig were going to solicit prospective investors for GACP II.  *Id*. at 452.

Sometime in the first two weeks of June 2017, Craig alleges that he entered into the putative contract covering his work on behalf of GACP II.  Plaintiff's Response at 13.  According to Craig, Rosiak "was relaying an offer made by" Ahn.[2] *Id*.  Rosiak also stated that he consistently "relay[ed] whatever [Ahn] told [him]" to the rest of the SBIC Group.  Plaintiff's APP. at 74.  Craig alleges that Rosiak again assured Craig, on August 29, 2017, that the terms of the purported oral contract were "still the same as June."  *Id*. at 335.

---

[2]     Contrary to this assertion,  Ahn stated that he did not authorize Rosiak to relay any such terms.  Defendants' APP. at 64.

Craig began calling prospective investors in late June 2017.  Plaintiff's Response at 14.  During this period, Ahn required weekly calls with the SBIC Group wherein the Group provided updates on their prospects and described successful fundraising strategies.  Plaintiff's APP. at 336-37.  Ahn also required weekly written reports from the SBIC Group regarding GACP II prospects.  *Id*. at 492.

Craig's efforts began to bear fruit with a prospective investor with whom Craig had a preexisting relationship ("GACP II Investor No. 1").  On July 17, 2017, Craig notified Ahn of GACP II Investor No. 1's interest by forwarding Ahn an email chain between Craig and the prospective investor.  *Id*. at 494-95.  In the email chain, Craig incorrectly identified himself to GACP II Investor No. 1 as part of the team that launched GACP II.  *Id*. at 495.  Ahn replied to Craig but did not correct Craig's assertion that he was affiliated with GACP.  *Id*. at 494.  GACP II Investor No. 1 eventually signed a subscription agreement, committing either $67 million or $74 million to GACP II.  *See* Defendants' Brief in Support at 12; Plaintiff's Response at 1.

In late August, Craig and Rosiak again discussed the terms of the alleged oral contract, this time over text message.  *See* Plaintiff's APP. at 419.  Craig asked Rosiak whether "GACP II would be 1.50% straight to [the SBIC Group] paid out over 2 years" to which Rosiak replied that the SBIC Group would be paid out "over 3 years."  *Id*.  Craig also noted that there wouldn't be a 60/40 split with FBR "since [GACP II is an] internal [client]."  *Id*.  Craig also expressed concern that the alleged

contract had not been reduced to writing, stating in another text message to Rosiak that the SBIC Group "may need to get [the contract] confirmed [with Ahn] in writing before" closing on any of the investors. *Id*.

On September 29, 2017, Harry Chung, Chief Operating Officer and Chief Financial Officer of GACP II, emailed Craig a copy of the GACP II Confidential Offering Memorandum, which was regularly given to prospective investors. See *id*. at 509. In relevant part, the Offering Memorandum specifies that "[t]o the extent that a placement agent is retained by GACP on behalf of the Partnership in connection with the offering . . ., the Partnership will pay all fees charged by such placement agent." *Id*. at 531.

On December 5, 2017, GACP II Investor No. 1, Ahn, Chung, and Craig met for about an hour. *Id*. at 327-28. After the meeting, Chung sent an updated Investor Presentation describing FBR and SBIC as conducting "investment banking" on behalf of GACP II and identifying the three groups as a "cohesive team." *Id*. at 696-98.

On January 18, 2018, Rosiak terminated Craig's employment. Plaintiff's Response at 17. After Craig's termination, GACP II Investor No. 1 committed between $67 million and $74 million in capital to GACP II, at least $43 million of which has been invested. Defendants' Brief in Support at 12. Craig has not been paid for any services rendered to GACP II.

B.  Procedural Background

Craig filed his complaint on January 8, 2019.  In his complaint, Craig asserts

breach of contract claims against both FBR and GACP II.  Complaint at 12-13.  In

the alternative, Craig asserts *quantum meruit* claims against both defendants as well.

*Id*. at 14-15.  Finally, Craig requests attorneys' fees.

On March 18, 2019, the defendants filed their answer ("Defendants' Answer")

(docket entry 9).  After completion of discovery, the defendants filed the instant

motion for summary judgment on all claims against both FBR and GACP II.  The

plaintiff filed his response on June 26, 2020.  Finally, on July 10, 2020, the

defendants filed a reply.  Reply Brief in Support of Motion for Summary Judgement

("Defendants' Reply") (docket entry 58).  The defendants' motion for summary

judgment is therefore ripe for determination.

II.  ANALYSIS

A.  Legal Standard

Summary judgment is proper when the pleadings and evidence on file show

that no genuine issue exists as to any material fact and that the moving party is

entitled to judgment as a matter of law.  FED. R. CIV. P. 56.[3]  A fact is material if the

---

[3]     The disposition of a case through summary judgment "reinforces the
purpose of the Rules, to achieve the just, speedy, and inexpensive determination of
actions, and, when appropriate, affords a merciful end to litigation that would
otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190,

                                                                    (continued...)

governing substantive law identifies it has having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor. *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 291 U.S. 253, 288-89 (1986)). When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id*. However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue of material fact. See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corporation v. Catrett*,

---

[3](...continued)
1197 (5th Cir. 1986).

- 12 -

477 U.S. 317, 324 (1986).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353, F.3d at 405.

### B.  Application

The court first considers Craig's breach of contract and *quantum meruit* claims against FBR before turning to Craig's claims against GACP II.

### 1.  *Claims against FBR*

#### a.  Breach of contract claim against FBR

Under Texas law, to establish a claim for breach of contract a plaintiff must show:  "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica Inc.*, 564 F.3d 386, 418 (5th Cir. 2009).  Regarding FBR, the defendants concede the existence of a valid contract and Craig's performance in securing investors for SBIC Fund 1.  Accordingly, only the latter two elements are in dispute.

Craig contends that FBR breached the Employment Agreement when it failed to compensate him after closing three investors for SBIC Fund 1.  Complaint at 12-13.  Specifically, Craig argues that FBR breached the Employment Agreement by refusing to pay him (1) commission under Section 2(b), and (2) carried interest

payments under Section 2(d).  In response, FBR argues that Craig was not entitled to

commission payments under Section 2(b) because Craig contributed less than 50% of

his annual base salary to the Pool.  *See generally* Defendants' Brief in Support at

14-17.  Regarding Craig's claim for carried interest payments, FBR argues that SBIC

Fund 1 did not perform well enough to accrue interest and, even if it had, Rosiak

would not have allocated Craig a carried interest payment under Section 2(d).

To determine the parties' rights and obligations under a contract, the court

looks to the terms of the contract.  After review, the court concludes that Craig was

not entitled to either commission payments or carried interest payments under the

Employment Agreement.

### i.  *Section 2(b) commission payments*

As previously stated, the Employment Agreement between FBR and Craig

provides that an SBIC Group member is entitled to a commission distribution if (1)

the Group member's interest in the Commission Pool exceeded 50% of the member's

"annual base salary" in the "relevant performance year," and (2) the member is

employed at the time of the distribution.  *See* Plaintiff's APP. at 49-50.

FBR convincingly argues that Craig satisfied neither of the two conditions.

First, Section 2(a) of the Employment Agreement defines Craig's "annual base salary"

as $160,000, requiring Craig to accumulate an $80,000 interest in the Group Pool.

*Id*. at 49.  It is undisputed, however, that Craig's accumulated interest in the Group

- 14 -

Pool for SBIC Fund 1 totaled only $32,000, well below the $80,000 threshold for a Section 2(b) distribution.  *See* Defendants' Brief in Support at 15-16.

Confronted with this obvious difficulty, Craig asserts three arguments in an attempt to circumvent the plain meaning of the Employment Agreement.  First, Craig contends that the definition of "annual base salary" should include only *actual* salary receipts earned until termination.  *See* Plaintiff's Response at 34.  Under Craig's theory, his "annual base salary" was only approximately $11,000 in the year he was terminated, well below his accumulated interest in the Group Pool.  *Id*. However, Craig fails to provide any sound reason for adopting this adjustable interpretation of a Group member's "annual base salary" depending on the date of termination. Nowhere does the Employment Agreement provide that an SBIC Group member's "annual base salary" be modified depending on the date of termination.  Indeed, such a schema would nullify the Employment Agreement's provision of an *annual* salary and Section 2(b)'s express condition that contributed interest in the Group Pool exceed 50% of the Group member's "*annual* base salary in the relevant Performance Year (defined from January 1 through December 31)."  Plaintiff's APP. at 50 (emphasis added).  The court therefore rejects this argument.

Craig next argues that the term "annual base salary" is ambiguous.  Generously construed, Craig contends that the Employment Agreement will define a term by placing the term "in parenthesis [sic] with quotes or uses the word 'defined'" and that

- 15 -

all terms that do not follow this blueprint – including Section 2(a) – are issues of fact incapable of resolution on summary judgment.  *See* Plaintiff's Response at 34-35.

Again, however, Craig relies on an ambiguity that simply does not exist.  "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  A court need not "search for ambiguities where the words used in the contract have a common and well understood meaning."  *T.C. Bateson Construction Company v. Lumbermens Mutual Casualty Company*, 784 S.W.2d 692, 696 (Tex. App. – Houston [14th Dist.] 1989, writ denied).  Nor does a mere "disagreement over the meaning of the contract provision . . .  render the provision ambiguous."  *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Company*, 3 S.W.3d 112, 120 (Tex. App. – Corpus Christi 1999, pet. denied).  Viewed in this common-sense light, the definition of "annual base salary" is crystal clear under the plain terms of the Employment Agreement:  "an annual base salary of $160,000 " means precisely that.  *See* Plaintiff's APP. at 49.  Accordingly, this argument fails.

Finally, Craig argues that, even if he had to contribute $80,000 before becoming eligible for a commission distribution, "Rosiak covered Craig's deficit" to the Group Pool.  Plaintiff's Response at 35.  Read in its proper context, however, it is not clear that Rosiak was referring to Craig's deficit under Section 2(b).  Rather, this

- 16 -

"deficit" could refer to any number of other benchmarks under which SBIC Group

members were measured.  Craig cites no other evidence or testimony corroborating

Craig's argument that Rosiak planned to, or did in fact, "cover" Craig's deficits for

purposes of Section 2(b) commission payments.  As such, this argument does not

pass muster under the summary judgment standard.  Craig therefore failed to satisfy

the first condition to receive a commission payment under Section 2(b).

Even if Craig accumulated the requisite interest in the Group Pool to become

eligible for a commission payment, Craig failed to satisfy the second condition under

Section 2(b) because his employment was terminated before he received a

distribution.  The Employment Agreement specifically provides that "distributions

from the SBIC Group Commission Pool . . . are contingent upon [the Group

member's] continued employment until" the time of distribution.  Plaintiff's APP. at

50.  Craig was fired on January 18, 2018, well before the quarterly mark on which

commission payments were distributed and, therefore, was not employed at the time

of distribution pursuant to Section 2(b).

In response, Craig argues that another provision of the Employment

Agreement renders Section 2(b)'s continued-employment condition ambiguous or

irrelevant.  *See* Plaintiff's Response at 35.  Specifically, Section 4(b) provides in

relevant part that if a Group member is fired without cause, the former member is

"entitled to . . . earned but unpaid commissions earned by [the member] pursuant to

Paragraph 2(b) above."  Plaintiff's APP. at 51-52.  It is undisputed that Craig was fired without cause.  However, because Section 4(b) only offers protection to "*earned*" but unpaid commissions under Section 2(b).  *Id*. (emphasis added).  For the reasons discussed above, Craig did not "earn" any commission payments under Section 2(b).

In sum, the court concludes that Craig was not entitled to commission payments under Section 2(b) or Section 4(b) of the Employment Agreement.

### ii.  Carried interest payments under Section 2(d)

As previously stated, the Employment Agreement provides that an SBIC Group member is entitled to a carried interest payment if (1) the investments closed by SBIC, on the whole, generate surplus interest; (2) the SBIC Group member is allocated a carried interest payment by Rosiak "in consultation with the Head of Investment Banking" at FBR; and (3) twelve months have passed since the closing date of the fund raise.  *Id*. at 51.  Craig and FBR dispute whether Rosiak's failure to consult Slosser, Head of Investment Banking at FBR, as contemplated by Section 2(d), constituted a breach.  *See* Plaintiff's Response at 36.

As FBR correctly points out, however, even if FBR breached the contract when Rosiak, without consulting Slosser, failed to allocate a carried interest payment to Craig,[4]  it is undisputed that SBIC has not received any interest from SBIC Fund 1.

---

[4]       The court notes that, under Texas law, parties to a contract have an obligation to perform duties and obligations specified by the contract in good faith.

(continued...)

- 18 -

Rosiak has maintained unequivocally that SBIC Fund 1 has not generated sufficient interest to provide for carried interest payments among SBIC Group members.  *See* Defendants' APP. at 57, 154.  Craig has pointed out no evidence to the contrary. Accordingly, Craig has suffered no injury from any technical breach that may have occurred.  The court concludes that FBR is entitled to summary judgment as to Craig's breach of contract claim.

b.  <em>Quantum meruit</em> claim against FBR

In the alternative, Craig claims unpaid compensation for his work on SBIC Fund 1 on a theory of *quantum meruit*.  *See* Complaint at 14.  "To recover under a quantum-meruit claim, a claimant must prove that:  (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged."  *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018).  However, a party "cannot recover under *quantum meruit* when there is a valid contract covering the services or materials furnished."  *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005).

---

[4](...continued)
*Dallas/Fort Worth International Airport Board v. Vizant Technologies, LLC,* 576 S.W.3d 362, 369 n.13 (Tex. 2019).

The general rule that *quantum meruit* is not available where there is a valid, controlling contract is subject to a limited exception.  Specifically, when "a party partially performs a contract, but was prevented from completing the contract due to the other party's breach," the partially performing party may recover despite the existence of a controlling contract.  *Walker & Associates Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 858 (Tex. App. – Texarkana 2010, no pet.).

Despite the controlling Employment Agreement, Craig claims that this exception applies because "FBR breached its contract with Craig when it prevented Craig from allegedly meeting his contributed interest and carried interest requirements by terminating his employment."  *Id*. at 37.  As explained above, however, FBR did not commit a cognizable breach of contract in failing to pay Craig commissions under Section 2(b) or carried interest payments under Section 2(d).[5] As Craig was an at-will employee, both parties also agree that Craig's termination, standing alone, cannot constitute a breach of contract.  Accordingly, the exception does not apply and Craig's *quantum meruit* claim against FBR fails.

FBR is therefore entitled to summary judgment on both of Craig's claims against it.

---

[5]     Even if FBR technically violated the terms of the Employment Agreement when Rosiak, without consulting Slosser, failed to allocate a carried interest to Craig, this supposed breach did not result in an injury to Craig and, therefore, does not satisfy each element of a breach of contract claim.

2. *Claims against GACP II*

Craig asserts breach of contract and, alternatively, *quantum meruit* claims against GACP II.

a. Breach of contract claim against GACP II

As stated above, to establish a breach of contract claim, a plaintiff must demonstrate "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins*, 564 F.3d at 418. GACP II disputes the existence and validity of the alleged oral contract.

Craig contends that GACP II breached the alleged oral contract when it refused to compensate him for soliciting investors for the fundraise and attracting GACP II Investor No. 1. Complaint at 13-14. Specifically, Craig argues that GACP II owes 1.5% of the final committed amount by GACP II Investor No. 1 per the terms of the alleged oral contract. *Id*. In response, GACP II argues that: (1) much of Craig's evidence of the oral contract relies on inadmissible hearsay; (2) the oral contract violates the statute of frauds; and (3) Rosiak had no authority to bind GACP II to the oral contract. Defendant's Brief in Support at 20-27.

The court resolves the preliminary evidentiary matters first before turning to the merits of GACP II's remaining arguments.

*i.  Evidentiary matters*

GACP II challenges as inadmissible Craig's testimony that Rosiak told Craig that Rosiak was "relaying an offer made by" Ahn.[6]  *See* Defendants' Reply at 11-14. GACP II argues that this testimony is double hearsay without exception and, therefore, should not be considered on summary judgment.  *Id*.  According to GACP II, both Ahn's alleged communication to Rosiak and Rosiak's alleged communication to Craig regarding his communication with Ahn constitute independent hearsay statements.  Craig counters that his testimony is admissible as a legally operative verbal act or as an admission by an agent under FED. R. EVID. 801(d)(2)(D). Plaintiff's Response at 22-24.

Hearsay is an out of court statement offered into evidence to prove the truth of the matter asserted.  FED. R. EVID. 801(c).  "Double hearsay" is excluded under Rule 801(c) unless "each part of the combined statements conforms with an exception to the hearsay rule."  WEISSENBERGER'S FEDERAL EVIDENCE (5th ed.)

---

[6]         GACP II appears, correctly, to accept the admissibility of the terms of the oral agreement allegedly communicated to Craig by Rosiak.  *See* 2 MCCORMICK ON EVIDENCE § 249 (8th ed.) ("When a suit is brought for breach of a written contract, no one would think to object that a writing offered as evidence of the contract is hearsay.  Similarly, proof of oral utterances by the parties in a contract suit constituting the offer and acceptance which brought the contract into being are not evidence of assertions offered testimonially but rather verbal conduct to which the law attaches duties and liabilities.").

§ 805.1.  Even if Craig's testimony contains double hearsay, it is admissible because each "layer" of the testimony falls under either an exclusion or exception to Rule 801(c).

First, Rosiak's communication to Craig that Rosiak was "relaying" an offer on behalf of Ahn is definitionally excluded from hearsay as a legally operative verbal act or, even if the statement falls under Rule 801(c), is admissible as a statement by a party's agent under Rule 801(d)(2)(D).

GACP II contends that Rosiak's communication to Craig that Rosiak was "relaying" an offer on behalf of Ahn is hearsay because "[t]he matter asserted is that Rosiak had express authority to bind GACP II to the alleged oral contract, and the statement is being offered as evidence of the truth of that statement."  Defendants' Reply at 12.  This characterization of Craig's testimony is misleading and confuses the underlying facts asserted by Craig's testimony – *viz.*, that Rosiak actually made the statement – with the legal significance of those implied facts – *viz.*, that Rosiak had the authority to make the offer to Craig.  This distinction is crucial because Rule 801(c) "exclude[s] from hearsay the entire category of 'verbal acts' . . . in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights."  FED. R. EVID. 801, Advisory Comm. Note to Subdivision (c).  Here, Craig's testimony that Rosiak was "relaying" an offer on behalf of GACP II carries legal significance because it demonstrates Rosiak's

authority to extend the offer.  As such, wholly apart from the truth of whether Rosiak

was actually "relaying" the offer on behalf Ahn, this "level" of Craig's testimony is a

legally significant verbal act and is, therefore, non-hearsay.

Even if this first level of Craig's testimony is hearsay and not a legally

operative statement, it is admissible as an exception to hearsay under Rule

801(d)(2)(D).  This Rule provides that a statement is excepted from the hearsay rule

if the statement was made "by the party's agent or employee on a matter within the

scope of that relationship and while it existed."  FED. R. EVID. 801(d)(2)(D).  "[T]he

statement of the agent or employee need only 'concern' a matter within the scope of

the agency or employment."  WEISSENBERGER'S FEDERAL EVIDENCE (5th ed.)

§ 801.20.  The breadth of such matters is "expansive."  2 MCCORMICK ON EVIDENCE

§ 259 (8th ed.).

Of course, the defendants dispute that Rosiak was acting as an agent for GACP

II.  But, contrary to GACP II's assertion that Craig "has the burden of establishing

the preliminary facts to bring the alleged statement within" the exception, the court

need not decide the issue of agency before determining the admissibility of Craig's

testimony under Rule 801(d)(2)(D).  *See* Defendants' Reply at 13.  Rather, "the

contents of the offered statement can be used to help establish that the declarant was

. . . the agent or employee of the party against whom the statement is offered."

WEISSENBERGER'S FEDERAL EVIDENCE (5th ed.) § 801.20.[7]   The Rule cautions only
that the statement cannot "by itself establish the . . . existence or scope of the
relationship under (D)."   FED. R. EVID. 801(d).   Here, Rosiak's statement, if true, is
relevant to establishing whether Rosiak was an agent of GACP II.   Accordingly,
Craig's testimony is admitted under Rule 801(d)(2)(D).

The "second level" of hearsay analysis can be dealt with more swiftly.   Craig's
testimony regarding Ahn's communication to Rosiak about the offer to Craig may
also be admitted under Rule 801(d)(2)(D).   It is undisputed that Ahn is GACP II's
corporate representative.   As president and general partner of GACP II, Ahn had
actual authority to hire and fire employees for purposes of furthering GACP II's
mission.   It is also uncontested that Ahn made the alleged communication to Rosiak
during Ahn's control of GACP II.   Accordingly, Ahn's alleged communication of the

---

[7]      See also *Moore v. KUKA Welding Systems & Robot Corporation*, 171 F.3d
1073, 1081-82 (6th Cir. 1999).   Weissenberger describes the holding and reasoning –
strikingly similar in structure the one at bar – as follows:   "[The] employee was
permitted to testify that another employee told him that a supervisor had told the
latter to pass along that some 'bad stuff' was going to happen to the plaintiff and that
the testifying employee should not get involved if he wanted to keep his job; in a
double hearsay analysis, the supervisor's statement made in the course of his
employment was not hearsay, as it was exempt under Rule 801(d)(2)(D); the
statement of the intermediary employee to the testifying employee was exempt under
the same rule, as the supervisor was asking him as an agent to pass along a message to
the testifying employee."   WEISSENBERGER'S FEDERAL EVIDENCE (5th ed.) § 801.20
n.213.

offer to Rosiak falls squarely within Rule 801(d)(2)(D) as an admission by GACP II's agent.

The defendant counters that "Rosiak and . . . Ahn denied that . . . Ahn ever told Rosiak that he had authority to bind GACP II to the alleged oral contract" and that there is "simply no evidence that the alleged statement was made."  Defendants' Reply at 12.  But GACP II conflates the admissibility issue with the burden of persuasion.  Whether Craig's testimony is credible in light of Rosiak's and Ahn's denials is a question reserved for the jury.  That the only direct evidence of Ahn's communication to Rosiak is Craig's own testimony is inconsequential on summary judgment.  As is the nature of oral contracts, direct evidence is often scarce and cannot be summarily construed against Craig at this stage.  Craig's testimony regarding the statements allegedly made by Ahn and Ahn is therefore admissible.

### ii.  Statute of Frauds

GACP II contends that the alleged oral contract is barred by the Texas statute of frauds because the contract cannot be completed within one year.  *See* Defendants' Brief in Support at 25-27.  Specifically, GACP II points to the term that the 1.5% placement fee would be paid out "in between two to three years."  *See* Plaintiff's APP. at 311.  Craig counters that the alleged oral contract does not fall within the statute of frauds for two independent reasons.  First, the anticipated date or period of compensation does not count toward the one-year limit on the statute of frauds and,

even if it did, the placement fee could have been paid within a year.  Plaintiff's
Response at 28.  Second, even if the oral contract could not be performed within one
year, the oral contract falls within the partial-performance exception to the statute of
frauds because the only remaining obligation under the contract is GACP II's tender
of payment.  *Id*. at 29-30.

The court first considers whether the purported oral contract is performable
within one year before turning to Craig's partial-performance exception.  The court
concludes that Craig is correct on both grounds.

### (1)   The oral contract was performable within one year

Under Texas law, an agreement "which is not to be performed within one year
from the date of making the agreement" is not enforceable unless the agreement is
reduced to a signed writing.  TEX. BUS. COM. CODE ANN. § 26.01(a), (b).[8]  The court
looks to the terms of the agreement to determine whether a contract can be
performed within one year.  *Hall v. Hall*, 308 S.W.2d 12, 14-15 (Tex. 1957).  In
doing so, the court compares "the date of the agreement to the date when the
performance under the agreement is to be completed."  *Kalmus v. Oliver*, 390 S.W.3d
586, 590 (Tex. App. – Dallas 2012, no pet.).  But it is "a well-established general rule

---

[8]        The court also notes that, although the text messages between Rosiak
and Craig are a "writing," the messages are not "signed" and do not contain all
material terms of the alleged oral contract and, therefore, do not satisfy the Texas
statute of frauds.  *See* TEX. BUS. COM. CODE ANN. § 26.01(a); *Haase v. Glazner*, 62
S.W.3d 795 (Tex. 2001).

- 27 -

that where no time is fixed by the parties for the performance of their agreement, and

there is nothing in the agreement itself to show that it cannot be performed within a

year according to its tenor and the understanding of the parties, the agreement is not

within" the statute of frauds. *Bratcher v. Dozier*, 346 S.W.2d 795, 796 (Tex. 1961).

Both parties appear to agree that Craig could have performed his "side of the

bargain" within one year.[9]  That is, it is uncontested that Craig could have solicited

and closed investors for GACP II Fund 1 within one year, thereby tendering

performance under the alleged oral contract.[10]  The issue, then, turns on whether the

"two to three year" period of compensation alone brings the purported oral contract

within the statute of frauds.

----

[9]     The defendant challenges as noncompliant with the statute of frauds only that portion of the alleged oral contract whereby GACP II would pay Craig a 1.5% placement fee "within two to three years."  Defendants' Brief in Support at 26.

[10]     Even if challenged on this point, however, the court is convinced that Craig could tender performance within one year in compliance with the statute of frauds.  Specifically, Craig points to documents filed by GACP II with the Securities and Exchange Commission clarifying Fund 1's duration as less than one year.  Plaintiff's Response at 29 n.143; Plaintiff's APP. at 505.  Additionally, Ahn maintained that GACP II Fund 1 would close in the first quarter of 2018 at the latest – less than one year from Craig's alleged employment by GACP II.  *Id*. at Plaintiff's APP. at 455-57, 466-72; see also *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982) ("[W]here the agreement, either by its terms *or by the nature of the required acts*, cannot be completed within one year, it falls within the statute [of frauds] and must therefore be in writing.  That is, where an oral contract omits the performance term, duration may properly be implied from extrinsic evidence.") (emphasis in the original).

Both Craig and GACP II recognize that the Texas Supreme Court decision in *Miller v. Riata Cadillac Company*, 517 S.W.2d 773 (Tex. 1974), is key to answering this question but they disagree on the meaning and applicability of the case.  In *Miller*, the plaintiff was employed as a used car manager pursuant to an oral contract – with one Mr. Riley, coincidentally – for a term of one year beginning on February 10, 1968.  *Id*. at 774.  Under the oral agreement, the plaintiff received a monthly salary of $350 plus an additional bonus of 2.5% of the annual net profits of his employer.  *Id*.  The plaintiff "alleged that this bonus was usually paid at the end of March following the year in which it was earned." *Id*.  The plaintiff was discharged on October 20, 1971.  His former employer refused to pay his annual bonus, for which the plaintiff sued.  The plaintiff's former employer sought summary judgment on the ground that the agreement was unenforceable under the Texas statute of frauds because the bonus was "usually" paid in March of the following year and, therefore, was not performable within one year.  *Id*. at 775.  Although the jury found in favor of the plaintiff, the trial court entered judgment n.o.v. for the defendant and the intermediate appellate court affirmed, holding that the oral agreement violated the statute of frauds.  *Id*.

In reversing, the Texas Supreme Court began by noting that oral contracts of indeterminate duration are generally not within the statute of frauds if performance could be conceivably completed within one year.  *Id*. at 776.  On this basis, the Texas

Supreme Court found that "[t]he fact that the bonus in question was not 'usually'
paid until March does not mean that it could not conceivably be ascertained and paid
within one year." *Id*. On all this the instant parties and the court agree. However,
Craig contends that *Miller* stands for a broader proposition. Indeed, the court
appeared to expand on existing law by noting that the "practice of not actually
compensating an employee for the services he has rendered until sometime after the
year in question will not bring the contract within the Statute of Frauds as long as
full performance under the contract within the year is possible." *Id*. After collecting
cases,[11] the court concluded that "the general rule is that the fact a bonus cannot be

---

[11]     *White Lighting Company v. Wolfson*, 438 P.2d 345 (Cal. 1968),
exemplifies these cases. There, the oral agreement provided that the plaintiff would
earn a weekly salary "and one percent of the annual gross sales . . . exceeding one
million dollars per year" payable quarterly. *Id*. at 342-43. After the plaintiff had
worked until the end of the calendar year – for which he was paid a bonus – and into
the next, he was fired. *Id*. at 345-46. His former employer refused to pay the annual
bonus for the second year on grounds that the bonus could not be ascertained and
paid within one year because the employer could not know the "annual gross sales"
for the year in which the plaintiff was fired. *Id*. The court found that "[w]hen [the
plaintiff's] employment relationship with [the defendant] was terminated, [the
plaintiff] had completely performed; [the defendant's] performance consisted of
nothing more than compensating" the plaintiff. *Id*. at 344. From this, the court
concluded that "[e]ven though part of an employee's compensation is to be measured
by annual receipts of the employer, the statute of frauds does not apply to an
employment contract unless its terms provide that the *employee* cannot completely
perform it within one year from the making of the contract." *Id*. at 343 (emphasis
added). The *Miller* court also cited *Dennis v. Thermoid Company*, 25 A.2d 886 (N.J.
1942), which held that "[t]he circumstance that the amount of the yearly bonus
could not be figured till after the books were closed after the first of the next year did
not bring the agreement within [the statute of frauds]. The work called for by the
(continued...)

ascertained and paid until after the year in which services were rendered does not bring the contract within the Statute of Frauds." *Id*.

The defendant argues that *Miller* is distinguishable because the time period in which the bonus was to be paid in that case was indeterminate whereas the instant oral contract specified that payments were to be made "in between two to three years." Defendants' Reply at 17. The defendant misinterprets the significance of this difference. Although it is true that the duration of payment in *Miller* was indeterminate, all signs by the court in *Miller* point to a more general statement about the relationship between an employee's compensation and calculating the duration of an agreement. Specifically, the *Miller* court, citing cases with determinate payment periods of greater than one year, deduced a "general rule" that even if payment "*cannot* be ascertained and paid until after the year in which services were rendered does not bring the contract within" the statute of frauds. *Miller*, 517 S.W.2d at 776 (emphasis added).[12] Additionally, this interpretation of *Miller* is

---

[11](...continued)
agreement was all performed within the year. The salary was earned. The only thing which remained to be done was a bookkeeping comparison of figures entered within the year with those of the previous year, and the fact that it could not be done till the books were closed for the year can make no difference in the result." *Id.* at 888.

[12]      Contrast this language with holdings by Texas courts regarding contracts of indeterminate duration. See *Keystone International, Inc. v. Ingham*, 593 S.W.2d 354, 357 (Tex. Civ. App. – Texarkana 1979, no writ) ("[I]n general the cases indicate that there must not be the slightest possibility that [the agreement] can be fully

(continued...)

consistent with the rest of Texas law which places the linchpin of the one-year rule on the employee's performance rather than on the reciprocal obligation of the employer to tender payment.[13]  See, e.g., *Robertson v. Pohorelesky*, 583 S.W.2d 956, 958 (Tex. Civ. App. – Waco 1979, writ ref'd n.r.e.) (holding that the mere fact that employer and employee had to wait one year before ascertaining gross profits from which to pay employee pro rata share did not bring oral contract within statute of frauds because duration of employee's work was indefinite).

Rather than applying merely to oral contracts with compensation periods of indeterminate duration, therefore, *Miller* is more accurately understood as removing from the statute of frauds those oral agreements under which an employee's performance is completable within one year but whose date of compensation – determinate or indeterminate – occurs or is set to occur more than one year after the date of the agreement.  Accordingly, the instant oral agreement between Craig and GACP II was performable within one year and, therefore, not subject to the statute of frauds.[14]

_____

[12](...continued)
performed within one year.") (quoting 2 CORBIN ON CONTRACTS § 444 (1950)).

[13]    As stated above, Craig's performance of the instant contract could have been performed within a year.

[14]    The court rejects Craig's argument that, because GACP II could theoretically have paid the 1.5% placement fee earlier than the "two to three year" period specified if it so elected, the oral agreement does not come within the statute

(continued...)

- 32 -

(2) <u>The oral contract comes within the partial-performance exception</u>

Even if the oral contract was not performable within one year because of the compensation term, the instant oral agreement is removed from the statute of frauds under the partial-performance exception.

"Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud." *Exxon Corporation v. Breezevale Limited*, 82 S.W.3d 429, 439 (Tex. App. – Dallas 2002, pet. denied). Such "fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance

---

[14](...continued)
of frauds. First, Texas law only assumes that performance is completable if the duration of performance is indeterminate. Thus, Craig incorrectly cites *Gerstacker v. Blum Consulting Engineers, Inc.*, 884 S.W.2d 845 (Tex. App. – Dallas 1994, writ denied), as support because the oral contract in that case did not specify a term for the employee's performance, unlike the alleged oral agreement at issue here. *Id.* at 849-850 ("Where the term of performance *is uncertain* such as a contract that merely provides for the performance of a particular act that can conceivably be performed within one year, [the statute of frauds] does not apply.") (emphasis added). In the normal course, however, the terms of the agreement control the duration of performance. Second, "[i]f a contract explicitly calls for performance over a period longer than one year, the mere theoretical possibility of termination of the contract within one year because of death or another fortuitous event does not take the contract out of the statute of frauds." *SBC Operations, Inc. v. Business Equation, Inc.*, 75 S.W.3d 462, 466 (Tex. App. – San Antonio 2001, pet. denied); see also *Mann v. NCNB Texas National Bank*, 854 S.W.2d 664, 668 (Tex. App. – Dallas 1992, no writ) (in the context of a loan agreement, the mere "possibility of prepayment within one year alone is not enough to satisfy the statute").

- 33 -

on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit." *Id*.  Furthermore, the conduct of the party claiming the exception must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App. – Texarkana 1989, no writ).  However, this exception "does not require full or even substantial performance by a party" to apply.  *Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 160 (Tex. App. – Houston [14th Dist.] 2017, no pet.). The partial-performance exception is especially potent when the only remaining obligation under the alleged agreement is payment for services already rendered. *Estate of Kaiser v. Gifford*, 692 S.W.2d 525, 526-27 (Tex. App. – Houston [1st Dist.] 1985, writ ref'd n.r.e.).

The instant oral agreement satisfies even these rigorous conditions.  When the evidence is viewed in the light most favorable to Craig, there is "strong evidence" supporting the existence of the agreement and its terms.  Several of the terms were reduced to text messages sent by Craig to Rosiak who, in turn, effectively confirmed them.  *See* Plaintiff's APP. at 419.  Nor was Craig a stranger to GACP II.  Indeed, Ahn communicated with Craig – over the phone and in person – on several occasions regarding Craig's work on GACP II Fund 1.  See *id*. at 336 (describing "weekly calls" with Ahn); *id*. at 492 (Ahn asking for weekly written reports by the SBCI Group); *id*.

at 494-95 (introducing GACP II Investor No. 1 to Ahn); *id*. at 439-440 (Ahn answering questions posed by Craig).  Craig was given various materials by GACP II regarding the solicitation process.  See *id*. at 93 (limited partnership agreement); 510 (confidential offering memorandum); 687-88 (investor presentation).  Accordingly, ample "corroborative" evidence – wholly apart from Craig's mere word – supports the terms, methods, and overall contours of the alleged oral agreement.  See *Duradril, L.L.C.*, 516 S.W.3d at 161.

Furthermore, Craig clearly expected compensation and suffered a detriment after putting in more than six months of work on behalf of GACP II.  Aside from Craig's own expectation of payment, both Rosiak and Ahn knew that SBIC Group members working on soliciting investors to GACP II Fund 1 expected to be compensated for their efforts.  *See* Plaintiff's APP. at 448; *id*. at 72-73.  Craig suffered a detriment because he was not compensated at all for any work done on behalf of GACP II, much less at a level corresponding to the alleged oral contract.  The corollary of this is, of course, that GACP II was able to close tens of millions of dollars in investments through Craig's solicitation of GACP II Investor No. 1 without paying Craig at all.  The statute of frauds defense cannot lie "when enforcement would allow the very fraud that was sought to be prevented."  *McElwee v. Estate of Joham*, 15 S.W.3d 557, 559 (Tex. App. – Waco 2000, no pet.).

GACP II responds that "the evidence plainly demonstrates that GACP II Investor No. 1 was only engaged in due diligence at the time of" Craig's termination and, accordingly, Craig did not "fully perform[] the terms of the alleged oral contract at the time of his termination." Defendants' Reply at 17. But this term was not part of the alleged oral contract and, even if it was, the "partial-performance" exception requires only that: *partial* performance. See *Duradril, L.L.C.*, 516 S.W.3d at 160.

Finally, Craig's conduct in soliciting investors on behalf of GACP II is "unequivocally referable" to the alleged oral agreement. Conduct is "unequivocally referable" to an agreement if the conduct "alone and without the aid of words of promise [is] unintelligible or at least extraordinary unless as an incident of [payment], assured, if not existing." *Chevalier v. Lane's, Inc.*, 213 S.W.2d 530, 533-34 (Tex. 1948). Ahn himself confirms the outlandishness of Craig's conduct in the absence of an agreement for compensation: Ahn "assumed" that Craig expected to be paid for bringing in prospective investors because that's simply "the way our business works, you get paid for doing things." Plaintiff's APP. at 448-49. Rosiak came to the same conclusion: "I would certainly want to know that, if we were going to help out [in bringing investors to GACP II], that there would be, you know, some sort of compensation; more than just a good show of face to the new owners of our firm. . . . I would hope [the investors] would generate some commission for the [SBIC Group] pool." *Id*. at 72-73. Nor was Craig's introduction of GACP II Investor No. 1

- 36 -

costless.  Craig had a long-running relationship with this particular investor, and their

continued relationship rested on mutual trust, respect, and confidentiality.  Craig

attempted to attend the December 5th meeting in person because GACP II Investor

No. 1 was "very particular about [Craig] being there in person for [the] first

meeting."  *Id*. at 927.

As such, even if the alleged oral agreement is covered by the statute of frauds,

it falls within the partial-performance exception and is not barred.

### *iii.  Agency*

Lastly, the court turns to whether Rosiak had authority to offer the alleged

oral contract on behalf of GACP II.  Craig contends that Rosiak had express, implied,

and apparent authority to extend the offer to him.  The court considers each in

turn.[15]

### (1)  Actual Express Authority

Craig contends that Rosiak had actual express authority to extend the offer on

behalf of GACP II.  Craig relies on three pieces of evidence to support his assertion

that Rosiak had actual express authority:  (1) Rosiak "specifically stated that he was

relaying an offer made by Ahn on behalf of GACP II"; (2) Rosiak maintained "that he

---

[15]    Although Craig alleges that Rosiak was only "relaying" an offer on
behalf of Ahn, a showing of authority to "relay" the offer (or to spontaneously create
one and extend it to Craig) is still necessary because the offer was not coming directly
from Ahn or another obvious principal on behalf of GACP II.

relayed [to Craig] whatever Ahn told" Rosiak; and (3) Ahn declared that he assumed Rosiak would relay the conversations between Ahn and Rosiak to Craig. Plaintiff's Response at 22. None of these pieces of evidence – alone or in conjunction with one another – demonstrate that Rosiak had actual express authority to create or extend an offer to Craig.

"Actual authority refers to responsibility a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 921 (Tex. App. – Houston [14th Dist.] 2011, pet. denied). "Actual authority is created through conduct of the principal communicated to the agent." *Texas Cityview Care Center, L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. App. – Fort Worth 2007, pet. dism'd). Express authority is delegated by words or conduct "that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal." *Metropolitan Insurance and Annuity Company v. Peachtree Settlement Funding, LLC*, 500 S.W.3d 5, 18 (Tex. App. – Houston [1st Dist.] 2016, no pet.).

Craig cannot make the requisite showing of actual express authority. The court begins with the observation that Rosiak's alleged statement that he was "relaying" an offer on behalf of Ahn is insufficient, standing alone, to constitute actual express authority. Because the statement was introduced into evidence under Rule

- 38 -

801(d)(2)(D), the statement cannot "by itself establish the . . . existence or scope of the [agency] relationship." FED. R. EVID. 801(d). Accordingly, Craig must adduce additional corroborating evidence demonstrating that Ahn "expressly and directly" authorized Rosiak to extend an offer on behalf of GACP II or create one from whole cloth. See *Metropolitan Insurance and Annuity Company*, 500 S.W.3d at 18. The only additional evidence that Craig points to is testimony that tends to show a close relationship between GACP II, Rosiak, and the SBIC Group. However, the mere existence of a close relationship between Rosiak and GACP II does not demonstrate an agency relationship. That Ahn and Roisiak discussed placement agent fees, met "face-to-face," shared internal GACP II documents, and revealed their private communications with the rest of the SBIC Group simply cannot be described as evidence that Ahn expressly, directly, and specifically authorized Rosiak to extend an offer to Craig or create one anew. *See* Plaintiff's Response at 23-25. As such, Rosiak did not have actual express authority to extend an offer to or directly hire Craig.

(2)  <u>Actual Implied Authority</u>

"An agent has actual authority to take action . . . implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act." RESTATEMENT (THIRD) OF AGENCY § 2.02(1); see also *Reliant Energy Services, Inc. v. Cotton Valley*

- 39 -

*Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App. – Houston [1st Dist.] 2011, no

pet.).   An interpretation of the principal's objectives is reasonable "if it accords with

the principal's manifestations and the inferences that a reasonable person in the

agent's position would draw from the circumstances creating the agency."

RESTATEMENT (THIRD) OF AGENCY § 2.02(3).  An agent with express authority to

achieve an objective also includes the implied authority to do all things proper, usual,

and necessary to achieve that end.  *Sheet Metal Workers Local Union 54 v. E.F. Etie*

*Sheet Metal Co.*, 1 F.3d 1464, 1471 (5th Cir. 1993), *cert. denied*, 510 U.S. 1117

(1994).  However, an agent must have actual authority in order to have implied

authority.  *Reliant Energy Services, Inc*., 336 S.W.3d at 783.

        Although Rosiak did not have actual express authority to hire Craig, the court

concludes that Rosiak had implied authority to hire Craig as incident to Rosiak's

actual authority to solicit investors on behalf of GACP II.

        It is undisputed that Rosiak had actual authority to solicit investors on behalf

of GACP II.  At one of several in-person meetings between Rosiak and Ahn early in

the relationship between SBIC and GACP II, the two discussed the "possible

engagement" of SBIC to assist in an upcoming fundraise.  Plaintiff's APP at 446.

This "possible engagement" quickly materialized into Rosiak's and SBIC's sustained

solicitation of investors.  Ahn's words and conduct sent an unmistakable signal to

Rosiak that Rosiak could seek out investors on GACP's behalf.  For example, Ahn

required weekly calls and reports regarding prospects, *id*. at 336, 429, shared

documents with prospective investors that described FBR and GACP II as a "cohesive

team," *id*. at 696, and ultimately green-lighted every solicitation, *id*. at 439.

Additionally, Ahn "definitely" knew that Rosiak and others in the SBIC Group were

going to solicit investors for the GACP fundraise.  Rosiak therefore had actual

authority to solicit clients on behalf of GACP II.

 Given the above context and circumstances, it would be perfectly reasonable

for Rosiak to infer that he had authority to extend an offer to other members of the

SBIC Group to assist in soliciting investors for GACP II.  Indeed, it is manifestly

unreasonable to think that Ahn would have communicated with and conducted

himself toward Rosiak in this manner except on the understanding that Rosiak would

use the machinery and expertise of the SBIC Group to solicit investors.  That is, from

the perspective of Ahn, surely the only possible way of achieving GACP II's objective

of soliciting tens of millions of dollars was to use the SBIC Group to collect potential

investors, perform adequate due diligence, and execute closing formalities.

 Nor did Ahn or Rosiak understand the eventual solicitations as merely "a good

show of face to the new owners of" FBR.  Plaintiff's APP. at 72.  As Ahn succinctly

put it, "that's the way [the] business works, you get paid for doing things."  *Id*. at

448-49.  Indeed, Ahn and Rosiak "probably" even discussed compensation fees

charged by SBIC.  *Id*. at 450.  Accordingly, if Ahn and Rosiak both reasonably

concluded that the SBIC Group would not solicit investors for free, but each also reasonably concluded that the rest of the SBIC Group would nonetheless assist in soliciting investors, Rosiak's implied authority to extend compensation offers on behalf of GACP II results necessarily. All this, in conjunction with Craig's testimony that Rosiak was merely "relaying" an offer on behalf of Ahn (rather than creating one from whole cloth) demonstrate that Rosiak had implied authority to hire Craig as incident to Rosiak's actual authority to solicit investors on behalf of GACP II. *Id*. at 452.[16]

### (3) Apparent Authority

"To establish apparent authority, one must show that a principal either knowingly permitted an agent to hold itself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952-53 (Tex. 1996). "A court may consider only the conduct of the principal leading a third party to believe that the agent has authority in determining whether the agent has apparent authority." *Id*. at 953. The principal's conduct must be such that it would lead a reasonably prudent person to

---

[16] GACP II finds it "absurd" "that an individual expressly authorized to solicit investors for an investment is also impliedly authorized to determine how he will be compensated for any investors that are solicited." Defendants' Response at 14-15. But this framing misrepresents the facts of the case. Craig is not arguing that Rosiak had authority create employment terms from thin air for himself and Craig. Rather, Craig is arguing that Rosiak had authority to extend an offer *on behalf* of GACP II.

believe that authority exists. *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778-79 (Tex. 1974).

The court concludes that Rosiak had apparent authority to propose a contract on behalf of GACP II. Ahn consistently looked to Rosiak as a conduit through which to communicate GACP II's position and preferences to SBIC Group members. For example, Ahn and Rosiak discussed the possibility of SBIC raising funds on behalf of GACP II and discussed "potential introductions" that the SBIC Group – including Craig specifically – could make to prospective investors, Plaintiff's APP. at 446; Ahn sent Rosiak the GACP II Investor Presentation and instructed Rosiak to "keep it internal" to SBIC, *id*. at 427; the two also "probably" discussed commission payments and fees during their in-person meetings which Ahn assumed would be relayed to Craig and the rest of SBIC. *Id*. at 450, 454. Ahn also directly controlled the solicitation process through a series of weekly updates, *id*. at 336, 429, and was the only one with power to "green-light" certain investors for the fundraise. *Id*. at 439. On these facts, a reasonable person could conclude that Rosiak would have the authority to communicate an offer on behalf of Ahn and GACP II.

b. *Quantum meruit* claim against GACP II

"To recover under a quantum-meruit claim, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be

charged, and were used and enjoyed by him; and (4) the person sought to be charged

was reasonably notified that the plaintiff performing such services or furnishing such

materials was expecting to be paid by the person sought to be charged." *Hill v.*

*Shamoun & Norman*, LLP, 544 S.W.3d 724, 732 (Tex. 2018).  However, a party

"cannot recover under *quantum meruit* when there is a valid contract covering the

services or materials furnished."  *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732,

740 (Tex. 2005).

The defendants' sole challenge to Craig's *quantum meruit* claim against GACP II

is that the claim is not ripe for review.  Defendants' Brief in Support at 27.  GACP II

argues that, under the terms of the alleged oral contract, "the placement fee for any

investments in GACP II was to be paid out over two to three years from GACP II's

final fundraise close" and, because the fundraise closed on June 1, 2018, GACP II

still has time to pay Craig.  *Id*.  This argument misses the mark because a *quantum*

*meruit* claim is asserted *in the absence* of a controlling contract.  Although Craig alleges

an oral contract, Craig asserts the *quantum meruit* theory in the alternative in the

event that the oral contract was defective, which he is entitled to do.  See *Cessna*

*Aircraft Company v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 467 (Tex. App. – Dallas

2006, pet. denied).  As the *quantum meruit* theory stands alone, the terms of the

alleged oral contract are not "engraft[ed]" onto Craig's *quantum meruit* claim.

Plaintiff's Response at 32.  Accordingly, GACP II's ripeness argument fails.

- 44 -

As Craig did not file a cross motion for summary judgment, the court withholds judgment on the remaining elements of Craig's *quantum meruit* claim at this time.

### 3. *Attorney's Fees*

Craig requests attorney's fees under Tex. Civ. Pract. & Rem. Code § 38.001 ("§ 38.001"). Plaintiff's Complaint at 14-15. That statute provides, in relevant part, that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." *Id*. § 38.001(8). However, a party must prevail on its underlying claims to recover attorney's fees. *R.J. Suarez Enterprises Inc. v. PNYX L.P.*, 380 S.W.3d 238, 249 (Tex. App. – Dallas 2012, no pet.).

Craig's claim for attorney's fees against SBIC fails because the court has already rejected Craig's substantive claims against SBIC for breach of contract and *quantum meruit*. The court also rejects Craig's claim for attorney's fees against GACP II because § 38.001 applies only to successful claims against "individuals" and "corporations" of which GACP II (a limited liability company) is neither. See *Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 452-55 (Tex. App. – Houston [14th Dist.] 2016, pet. denied); *Hoffman v. L&M Arts*, No. 3:10-CV-0953-D, 2015 WL 1000838, at *7-*10 (N.D. Tex. Mar. 6, 2015) (Fitzwater, J.), *aff'd*, 838 F.3d 568 (5th Cir. 2016).

Craig also appears to argue that attorney's fees may be granted as an equitable remedy not subject to the conditions of § 38.001.  Plaintiff's Response at 37.  However, under Texas law, which follows the "American Rule," "litigants may recover attorney's fees only if specifically provided for by statute or contract."  *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011).  No statute or contract provision provides for such relief here.  Accordingly, Craig's claim for attorney's fees is denied.

### III.  CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.  The court **GRANTS** the defendants' motion for summary judgment as to all claims against FBR.  The court **DENIES** the defendants' motion for summary judgment as to all claims against GACP II.  The court further **GRANTS** defendants' motion for summary judgment against Craig's claim for attorney's fees.

**SO ORDERED**.

November 23, 2020.

_A. Joe Fish_

A. JOE FISH
Senior United States District Judge